# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CATHERINE LEE FREEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16-CV-534-JHP-PJC** |
| | ) | |
| **(1) STANLEY GLANZ, in his** | ) | |
| **individual capacity;** | ) | |
| **(2) VIC REGALADO, TULSA** | ) | |
| **COUNTY SHERIFF, in his** | ) | |
| **official capacity; and** | ) | |
| **(3) ARMOR CORRECTIONAL** | ) | |
| **HEALTH SERVICES, INC.,** | ) | |
| **a foreign corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION & ORDER

Before the Court are (1) Defendant Armor Correctional Health Services, Inc.'s ("Armor") Motion for Summary Judgment (Dkt. 43) and (2) Defendants Stanley Glanz ("Glanz") and Vic Regalado's ("Regalado") Motion for Summary Judgment (Dkt. 46). Also before the Court are motions to strike two exhibits filed by the Plaintiff (Dkts. 71, 72, 82). After consideration of the briefs, and for the reasons stated below, the Motions are **GRANTED**.

## BACKGROUND

On September 15, 2014, Plaintiff Catherine Freeman ("Plaintiff") was arrested and booked into the David L. Moss Criminal Justice Center ("DLM") for

Driving Under the Influence Second Offense and Leaving the Scene of a Property Damage Accident. (Dkt. 43-2 (Arrest and Booking Data)).[1]  After being booked into DLM, Plaintiff received a patient intake health screening. (Dkt. 43-1 (Armor Records)).  According to Armor's records, Plaintiff reported no history of epilepsy or seizures, and no history of drug withdrawal problems, at the initial screening. (*Id.* at 9, 11).  Plaintiff disclosed she took opioids (Percocet) daily. (*Id.* at 10).

On September 16, 2014, at 1:45 p.m., Plaintiff submitted an inmate request, stating she was detoxing off Lexapro, Valium, and Percocet and requesting help with her depression and anxiety. (Dkt. 43-4 (Inmate Requests), at 2).  An Armor provider responded later that day with a statement that a mental health professional would come to assess her. (*Id.*).  Between September 17 and September 23, 2014, Plaintiff was assessed nine times by medical staff—twice on September 17th, twice on September 18th, and once on September 19th, 20th, 21st, 22nd, and 23rd. (Dkt. 43-1 (Armor Records), at 32-49, 81, 83-84).  At these assessments, Armor's records reflect Plaintiff inconsistently reported her history of seizures and her current medications. (*Id.*).  At her deposition, Plaintiff testified she had previously suffered one seizure, in 2007, caused by a high fever, but that she had never had a

---

[1] In the Background section of this Opinion and Order, the Court refers primarily to the evidence presented in Armor's Motion for Summary Judgment (Dkt. 43).  However, Glanz and Regalado present largely the same evidence in support of their own Motion for Summary Judgment (Dkt. 46).  Therefore, the evidence cited in this section is relevant to both Motions.

seizure caused by drug withdrawal. (Dkt 43-3 (Plaintiff Deposition), 21:21-22:6, 24:21-25, 95:5-22).

On September 17, 2014, Plaintiff reported diarrhea, for which an LPN administered Kaolin-Pectin (Bismuth Subsalicylate), but Plaintiff did not complain of seizures. (Dkt. 43-1 (Armor Records), at 33-35, 70; Dkt. 43, at 3 (Armor's Uncontroverted Fact No. 12)). Also on September 17th, Plaintiff submitted an inmate request form, asking to be seen for her PTSD, panic disorder, major depression, and agoraphobia. (Dkt. 43-4 (Inmate Requests), at 2). An Armor provider responded later that day, stating she was scheduled to see a Mental Health Professional. (*Id.*).

On September 18, 2014, Plaintiff submitted a sick call request form, complaining of withdrawal from Percocet, Morphine, Valium, Trazodone, and Lexapro. (Dkt. 43-1 (Armor Records), at 111). She reported an inability to sleep all night, intense stomach pain and diarrhea, blood in her stool, weakness, and inability to eat. (*Id.*). Armor records indicate she was seen in the medical unit on the same day. (*Id.*).[2] Armor records also show Dr. Thomas Gable was contacted

---

[2] Plaintiff disputes whether Plaintiff was seen in response to this sick call request, stating there is no evidence she was seen. (Dkt. 53, at 3 (Plaintiff's Response to Uncontroverted Fact No. 14)). However, the notes in the nursing staff section of the sick call request form specifically state Plaintiff was "seen in medical 9/18/14." (Dkt. 43-1 (Armor Records), at 111). Therefore, the Court will deem this fact to be uncontroverted.

to report Plaintiff's withdrawal symptoms. (*Id.* at 39). The records indicate Dr. Gable ordered to start Plaintiff on Clonidine (withdrawal medication) and Phenergan. (*Id.*). Armor records show Plaintiff regularly received Clonidine, Phenergan, and other medication between September 18 and September 23, 2014, although on some occasions Plaintiff did not receive Clonidine because her blood pressure was too low. (*Id.* at 70-72).

On September 20, 2014, Plaintiff submitted two inmate request forms related to health care. In the first request, Plaintiff asked to have her blood pressure rechecked for detoxification, and she requested Clonidine for detox. (Dkt. 43-4 (Inmate Requests), at 3). In the second request, Plaintiff asked to be seen by a psychiatrist for depression and anxiety, stating, "after being off my meds, I become tearful, withdrawn, racing thoughts, insomnia, and then feel suicidal. Help." (*Id.*). Later that day, Plaintiff was assessed for back pain by medical staff and given acetaminophen. (Dkt. 43-1 (Armor Records), at 42-43). On September 21, 2014, in response to her complaint of feeling suicidal, Plaintiff was placed in the medical unit on suicide watch. (Dkt. 43-4 (Inmate Requests), at 3). That same day, Plaintiff submitted an inmate request stating she was not suicidal and just needed to see the psychiatrist or therapist. (*Id.* at 4).

On September 23, 2014, Plaintiff received a mental health evaluation from an LPC. (Dkt. 43-1 (Armor Records), at 49). Plaintiff reported she was not suicidal but was suffering from side effects, and she requested her medications. (*Id.*). Plaintiff did not report any seizures. (*Id.* at 50). Plaintiff was released from suicide watch on September 23, 2014. (Dkt. 43-10 (DLM Inmate Housing History)). That same day, an LPN contacted Dr. Gable to report that Plaintiff was at the end of detox but still nauseated. (Dkt. 43-1 (Armor Records), at 53). Dr. Gable ordered to continue administering Phenergan. (*Id.*). Plaintiff did not submit any health care requests or medical complaints between September 24, 2014, and October 2, 2014. (*Id.*).[3]

On the morning of October 3, 2014, Plaintiff was found unresponsive on the floor with blood on her hands. (Dkt. 43-12 (Jail Shift Report)). A medical emergency was called, and Plaintiff was taken immediately to the medical unit. (*Id.*). In the medical unit, Plaintiff was assessed by an LPN, who noted she was found lying on her right side, unresponsive to pain stimuli and shaking, with blood in her hair and on her face. (Dkt. 43-1 (Armor Records), at 54). The nurse further

---

[3] Plaintiff disputes whether Plaintiff submitted any medical requests during this period, stating that "Plaintiff recalls submitting requests, but Armor has failed to produce them." (Dkt. 53, at 4 (Plaintiff's Response to Armor's Uncontroverted Fact No. 24)). However, Plaintiff cites to no evidence in support of this bare statement. Therefore, the Court will deem this fact to be uncontroverted. *See* Fed. R. Civ. P. 56(c).

noted she was unable to obtain any vital signs except respiration and temperature, due to her shaking. (*Id.*).[4] The nurse called Dr. Gable within minutes of Plaintiff's arrival at the medical unit, and Dr. Gable advised he was on his way to assess Plaintiff. (*Id.*). Dr. Gable assessed Plaintiff, reviewed her history of anxiety and panic attacks, and noted she had no seizure history. (*Id.* at 107). Dr. Gable noted a small wound on her chin, to which he applied a steri-strip. (*Id.* at 107-08). He ordered neurological checks every two hours and 23 hours of observation in the medical unit. (*Id.* at 108, 110). Plaintiff was given a dose of Hydroxyzine Pamoate. (*Id.* at 72).

In the Segregated Unit under observation, Plaintiff was checked approximately every thirty minutes. (Dkt. 43-13 (Segregated Activity Record)). Plaintiff was noted as being awake and voiced no needs from October 3, 2014, at 10:45 a.m. through October 4, 2014, at 3:33 a.m., at which time Plaintiff was noted to be asleep. (*Id.* at 5; Dkt. 43, at 6 (Armor's Uncontroverted Fact No. 33)). At

---

[4] The relevant nurse's note reads, "Unable to obtain any V/S except resp and temp 99.2 and resp 18 D/T I/M shaking." (Dkt. 43-1, at 54). Plaintiff asserts the "D/T" abbreviation in this note is a reference to delirium tremens, a side effect of withdrawal. (Dkt. 53, at 4 (Plaintiff's Response to Armor's Uncontroverted Fact Nos. 26, 28)). However, Plaintiff cites to no evidence in support of this interpretation of the nurse's notes. By contrast, Armor submits an affidavit from its expert, Dr. David Hellerstein, M.D., Ph.D, C.C.H.P., which states the "D/T" abbreviation stands for "due to." (Dkt. 77-1, ¶ 25). Given Plaintiff's utter lack of evidence in support of its interpretation, and Dr. Hellerstein's interpretation which is appropriate in the context of the note, the Court concludes there is no genuine issue of fact regarding the meaning of "D/T" and adopts Armor's interpretation. *See* Fed. R. Civ. P. 56(c).

6:00 a.m. on October 4, 2014, Plaintiff was noted to be awake and calm. (Dkt. 43-13 (Segregated Activity Record); Dkt. 43, at 6 (Armor's Uncontroverted Fact No. 33)).

At approximately 11:18 a.m. on October 4th, Plaintiff was observed having possible seizure-like activity. (Dkt. 43-14 (Dr. Gable Statement); Dkt. 43, at 6 (Armor's Uncontroverted Fact No. 34)). A nurse began responding to Plaintiff's condition with stimulation, but Plaintiff remained unresponsive. (Dkt. 43-15 (Jail Incident Report); Dkt. 43, at 6 (Armor's Uncontroverted Fact No. 35)). A medical emergency was called, and Nurse Cynthia Fairchild and Dr. Gable responded to the emergency. (Dkt. 43-1 (Armor Records), at 59-60; Dkt. 43-14 (Dr. Gable Statement); Dkt. 43-15 (Jail Incident Report)). Nurse Fairchild noted Plaintiff was having "seizure activity," with white foam coming from her mouth, clenching of her teeth and hands, and contraction of her feet. (Dkt. 43-1 (Armor Records), at 60). Dr. Gable ordered Plaintiff be given Benadryl 50 mg, which temporarily resolved the symptoms. (*Id.*). Dr. Gable ordered she be transferred to a room with a camera and be placed on a boat. (Dkt. 43-14 (Dr. Gable Statement)). However, as Plaintiff was being moved, she began seizing again and became cyanotic (blue discoloration). (*Id.*). Her pulse oximeter dropped, and Dr. Gable ordered oxygen and Ativan to be given. (*Id.*). Plaintiff was moved into the hallway and suction at

the mouth was attempted, but Plaintiff's teeth remained clenched. (Dkt. 43-1 (Armor Records), at 60). At 11:45 a.m., Dr. Gable ordered 911 to be called to transport Plaintiff to the emergency room, and an ambulance arrived at approximately 11:55 a.m. (*Id.*). Once the EMSA ambulance arrived, Armor providers turned over Plaintiff's care to the emergency responders. (Dkt. 43, at 7 (Armor's Uncontroverted Fact No. 41)).

On October 5, 2014, Dr. Gable spoke with Plaintiff's treating provider at OSU Medical Center, who stated Plaintiff had bilateral pneumothorax (collapsed lung). Dkt. 43, at 7 (Armor's Uncontroverted Fact No. 42); Dkt. 43-1 (Armor Records), at 108); Dkt. 43-14 (Dr. Gable Statement)). Dr. Gable noted Plaintiff did not have these issues prior to her transfer to the emergency room, but he did observe the emergency providers had difficulty intubating her, as Plaintiff was bucking and on the floor in a boat. (Dkt. 43, at 7 (Armor's Uncontroverted Fact No. 42); Dkt. 43-1 (Armor Records), at 108). Dr. Gable later noted the hospital had informed him that Plaintiff had suffered an esophageal perforation from a traumatic intubation. (Dkt. 43-1 (Armor Records), at 109).

Armor has submitted a medical expert report from Dr. David Hellerstein, M.D., Ph.D, C.C.H.P. (Dkt. 43-6). Dr. Hellerstein's opinion as an internist and expert in correctional health care is that on October 4, 2014, Plaintiff suffered an

8

esophageal perforation as a complication of traumatic intubation. (*Id.* at 1). Dr. Hellerstein's opinion is that Armor healthcare providers closely monitored Plaintiff's medical condition and responded appropriately to Plaintiff's withdrawal symptoms when indicated. (*Id.* at 7). Dr. Hellerstein identifies no issues with Armor personnel's response to Plaintiff's medical emergencies on October 3 or 4, 2014, prior to the transfer of medical authority to the EMS responders. (*Id.* at 6-7). Plaintiff has submitted no medical expert evidence in support of her case.

Plaintiff filed her original Petition in this case on July 1, 2016, and an Amended Petition on July 22, 2016. (Dkt. 3-1; Dkt. 3-3). In the Amended Petition, Plaintiff asserts a total of nine causes of action against four defendants— Armor, Glanz, Regalado, and American Medical Response Ambulance Service, Inc. ("AMR"). Plaintiff dismissed AMR with prejudice on October 13, 2017. (Dkt. 106). Plaintiff now seeks: (1) relief under 42 U.S.C. § 1983 against Armor, Regalado, and Glanz for cruel and unusual punishment in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution, by being deliberately indifferent to Plaintiff's serious medical needs, health, and safety (Counts VI, VII, VIII[5]); (2) recovery against Armor for

---

[5] These three counts are all identified in the First Amended Petition as "Count VII," but the Court will identify them in order as Counts VI, VII, and VIII for ease of reference.

negligence in failing to provide adequate or timely evaluation and treatment of Plaintiff and in failing to reasonably or timely treat Plaintiff's serious medical condition (Count II); (3) recovery against Armor for negligent hiring, training, and supervision of its agents and employees (Count V); (4) relief against Regalado under the Oklahoma Government Tort Claims Act ("OGTCA"), 51 Okl. St. § 151 *et seq.*, for breach of the duty of care to Plaintiff, by failing to provide competent medical treatment (Count I); (5) recovery against Regalado for negligent hiring, training, and supervision of its agents and employees, in violation of the OGTCA (Count IV); and (6) relief against Regalado for violating Plaintiff's rights under Article II §§ 9 and 30 of the Oklahoma Constitution, pursuant to *Bosh v. Cherokee County Governmental Building Authority*, 305 P.3d 994 (Okla. 2013) (the "*Bosh* claim") (Count IX).  (*Id.* ¶¶ 76-93, 101-156).  Plaintiff seeks damages for her injuries and pain and suffering, as well as punitive damages.

Armor has now filed a Motion for Summary Judgment on Plaintiff's claims against it.  (Dkt. 43).  Plaintiff filed a Response in opposition (Dkt. 53), and Armor filed a Reply (Dkt. 77).  Glanz and Regalado have also jointly filed a Motion for Summary Judgment on Plaintiff's claims against them.  (Dkt. 46).  Plaintiff filed a Response in opposition (Dkt. 54), and Glanz and Regalado filed a Reply (Dkt. 73). The defendants have also moved to strike two exhibits filed by Plaintiff in

opposition to both Motions for Summary Judgment—declarations of Billy McKelvey (Dkts. 53-1, 54-1) and Shannon Clark (Dkts. 53-2, 54-2). (Dkts. 71, 72, 82). The Motions are fully briefed and ripe for review.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

However, a party opposing a motion for summary judgment may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994) ("Even though all doubts must be resolved in [the nonmovant's] favor, allegations alone will not defeat summary judgment.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

11

Moreover, "[i]n a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted). Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## I.     Motions to Strike

As an initial matter, the Court will address the Defendants' Motions to Strike two declarations Plaintiff submitted as exhibits to her Responses to the Motions for Summary Judgment (*See* Dkt. 53-1, at 4-29, Dkt. 53-2, at 4-29 (Declaration of Billy McKelvey); Dkt. 54-1, Dkt. 54-2 (Declaration of Shannon Clark)).

Federal Rule of Civil Procedure 56(c)(4) governs the use of declarations used in opposition to a motion, requiring such declarations to "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." A party

12

"may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). When an affidavit submitted in opposition to a motion for summary judgment contains inadmissible evidence, the court should disregard the inadmissible portions of the affidavit. *See Lee v. Nat'l Life Assurance Co.*, 632 F.2d 524, 529 (5th Cir. 1980).

Because statements in a declaration must be based upon personal knowledge of the matter asserted, "'statements of mere belief'" in a declaration "must be disregarded." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)). Moreover, a summary judgment affidavit may not contain expert testimony unless the affiant has first been designated an expert witness under Fed. R. Civ. P. 26(a)(2). *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) (citation omitted). Otherwise, "non-expert testimony in the form of opinions or inferences must be '(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of the fact in issue, and (c) not based on scientific, technical, or other specialized knowledge.'" *Id.* at 1123 (quoting Fed. R. Evid. 701).

In addition, inadmissible hearsay evidence in a declaration does not satisfy the requirement of personal knowledge. *Treff v. Galetka*, 74 F.3d 191, 195 (10th

Cir. 1996) (citing *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)).

Moreover, a conclusory, self-serving declaration or affidavit, unsupported by

material facts, is insufficient to survive summary judgment. *Skrzypczak v. Roman*

*Catholic Diocese of Tulsa*, 611 F.3d 1238, 1244 (10th Cir. 2010).

### A. Declaration of Billy McKelvey

First, Plaintiff submits a declaration from Billy McKelvey. (Dkt. 53-1, at 4-

9; Dkt. 54-1, at 4-9).[6] McKelvey states in his declaration that he was employed by

the Tulsa County Sheriff's Office from August 2008 to August 2015, and he was

the Captain in charge of the Jail Criminal Investigations Unit ("JCIU") at DLM

from March 2013 through April 2014. (Dkt. 53-1, at 4 ¶¶ 1-2). McKelvey states

that while serving as Captain he supervised Deputy Eric Beck, who prepared a

report regarding Plaintiff's medical emergency at DLM on October 4, 2014. (*Id.* at

4 ¶ 3 & Ex. 4). McKelvey states he is also familiar with the security camera

system and the layout at DLM. (*Id.* at 4 ¶ 6).

McKelvey states that, based on his review of Deputy Beck's report, and his

review of two video recordings produced by Glanz pertaining to Freeman (*Id.*, Exs.

1-2), he is "convinced" that Deputy Beck "secured, reviewed and saved more

---

[6] The declaration and exhibits are identical in both Responses to the Motions for Summary
Judgment. For simplicity, the Court refers primarily to Dkt. 53-1 throughout this section.

video camera recordings than the two video security camera recordings that were provided by Defendant Glanz." (*Id.* at 6 ¶ 14). McKelvey states that Deputy Beck's report described what he witnessed on the video security camera recordings, which would be possible only if Deputy Beck watched additional camera footage than the two recordings Glanz provided. (*Id.* at 6 ¶ 14). McKelvey further states his belief that Deputy Beck would have saved additional video security camera recordings on the JCIU shared drive and on a backup compact disk recording. (*Id.* at 7 ¶ 15). McKelvey also states his belief that Deputy Beck's report may have been changed since Deputy Beck wrote the report. (*Id.* at 7 ¶ 17).

Finally, McKelvey states that he served as the Administrative Captain/Assistant Jail Administrator at DLM from December 2014 through May 2015, and (1) during that time he "calculated" and "was personally aware" that Armor understaffed DLM based on the contract terms with Tulsa County, (2) Armor's medication practices resulted in delays of up to 14 days until inmates received medications, (3) he was personally aware that Armor physician Dr. Loper would not prescribe psychotropic medications to inmates with mental health issues who had previously been taking such medication, (4) based on his review of Dr. Loper's notes, Dr. Loper would not have prescribed psychotropic medications to Plaintiff, and (5) based on his review of security camera footage provided by Glanz

15

and related reports, he believes Armor personnel used a suction device on Plaintiff. (*Id.* at 8-9 ¶¶ 18-29).

Armor moves to strike the McKelvey Declaration, arguing it is not based on personal knowledge, contains inadmissible hearsay, is comprised of mere conclusory statements, and contains improper expert opinion testimony by a witness who was not disclosed as an expert witness in accordance with the scheduling order, nor who is qualified to render such expert opinions. (Dkt. 72). Glanz and Regalado also move to strike the McKelvey Declaration, for largely the same reasons. (Dkt. 82). Plaintiff responds that striking the declaration is unwarranted. (Dkt. 90). As explained below, the Court agrees with the Defendants that McKelvey's declaration is predominantly comprised of statements that are speculative, not based on his personal knowledge, and improper expert opinion. Therefore, the entire McKelvey Declaration will be stricken and not considered by the Court on summary judgment.[7]

---

[7] Plaintiff appears to complain in his Response that it is improper to strike McKelvey's assertions related to McKelvey's own name and employment history. While those paragraphs are not themselves improper, they are meaningless without the following paragraphs, which are stricken as improper. Therefore, the Court finds no basis for considering only the beginning paragraphs of the McKelvey Declaration.

### 1. Video Footage

The first part of the declaration, following McKelvey's description of his background and familiarity with practices at the JCIU and DLM's layout (Dkt. 53-1, at 4 ¶¶ 1-6), describes his review of DLM video footage and conclusions regarding Deputy Beck's incident report. (*Id.* at 4-5 ¶¶ 7-17). McKelvey's opinion statements in this regard are improper expert opinions given by a non-expert. McKelvey's conclusions are based upon review of documents and video footage, rather than his knowledge as a fact witness. For example, based on his review of Deputy Beck's report and video security recordings provided to him, along with his "knowledge of the training and practices of the deputies of the JCIU, including Deputy Beck," McKelvey is "convinced that Deputy Beck secured, reviewed and saved more video security camera recordings then [sic] the two video security camera recordings that were provided by Defendant Glanz." (Dkt. 53-1, at 6 ¶ 14).

Moreover, McKelvey's opinions in this section are highly speculative. For example, McKelvey states he "believe[s]" Deputy Beck's full report is saved on the JCIU shared drive on the Tulsa County IT storage server, based on his knowledge of the training and practices of JCIU deputies. (Dkt. 53-1, at 7 ¶ 15). This statement based on "belief" is inadmissible and improper. Further, McKelvey

states he "believe[s]" Deputy Beck's report "may have been changed since Deputy Beck wrote the report," based on his review of the report and the training and practices of the JCIU deputies. (*Id.* at 7 ¶ 17). This statement is also purely speculative and based on his belief, which is improper. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings; [they] must be based on more than mere speculation, conjecture, or surmise.") (quotation omitted).

For these reasons, the paragraphs in the McKelvey Declaration pertaining to video footage (Dkt. 53-1, at 1-5 ¶¶ 7-17; Dkt. 54-1, at 1-5 ¶¶ 7-17) are hereby stricken and will not be considered by the Court on summary judgment.

### 2.    Armor's Practices

The second part of McKelvey's declaration, which pertains to Armor medical personnel and medication practices (Dkt. 53-1, at 5, ¶¶ 18-24), also renders inadmissible opinions and speculation not based on personal knowledge. McKelvey states he became familiar with Armor's practices during his employment at DLM (*Id.* ¶¶ 18-19). Based on this familiarity, McKelvey calculates that Armor understaffed DLM from July to December 2014. (*Id.* ¶¶ 20-21). This stated familiarity does not establish personal knowledge of Armor's staffing at DLM, nor is it made clear precisely what McKelvey means by the

conclusory term "understaffed." Similarly, McKelvey's claimed familiarity with Armor's medication administration practices does not establish personal knowledge of Armor's practices in ordering medication or of Dr. Loper's prescription practices. (*Id.* ¶¶ 22-24). McKelvey's speculation that, based on review of Dr. Loper's notes, Dr. Loper would not have prescribed psychotropic medications to Plaintiff, is purely a medical opinion that McKelvey, a non-expert, is not qualified to render. McKelvey does not claim to be a medical professional, nor does McKelvey claim he supervised, assisted, or even worked with Armor personnel in their provision of medical care to inmates.

In her Response brief, Plaintiff argues the characterization of McKelvey's testimony in paragraphs 18-29 as expert testimony is inappropriate, because McKelvey observed the practices described. (*See* Dkt. 90). The Court disagrees, as McKelvey's declaration fails to refer to any specific incidents he observed or to otherwise establish personal observation of Armor's practices, and he renders improper medical opinions regarding whether Dr. Loper would have prescribed medications to Plaintiff. Plaintiff further argues McKelvey's position at DLM does not disqualify him from having personal knowledge of Armor's practices. However, Plaintiff introduces no evidence to establish that McKelvey's position at DLM would qualify him to render opinions about Armor's medical practices,

including its staffing levels and prescription practices. Consequently, McKelvey's statements regarding Armor's staffing and provision of health care (Dkt. 53-1, at 5 ¶¶ 18-24; Dkt. 54-1, at 5 ¶¶ 18-24) must be stricken as inadmissible. *See Peterson v. Garmin Int'l, Inc.*, 833 F. Supp. 2d 1299, 1306 (D. Kan. 2011) (disregarding statements in affidavits as statements of mere belief "to the extent the content of any such statement is obviously not substantively within the personal knowledge or perception of the witness.") (citing Fed. R. Evid. 602).

### 3. Use of Suction Device

In addition, McKelvey's statements regarding witnessing Armor's use of a suction device on inmates immediately following an inmate having a seizure (Dkt. 53-1, at 8 ¶¶ 25-27) are improper expert opinions rendered by a non-expert. McKelvey states that he personally witnessed Armor personnel use a suction device on inmates "to suck out salvia [sic], mucus or other material from an inmate's mouth and throat" and "immediately following an inmate having a seizure." (*Id.* at 8 ¶¶ 25, 27). However, McKelvey does not state that he has any knowledge of medicine, received any training in use of a suction machine, or ever worked with Armor personnel or others in using a suction device. Therefore, it is unclear how McKelvey would know either the purposes for which a suction device was used or when an inmate was having a seizure. The Court finds these

statements are speculative, conclusory, and not based on personal knowledge. McKelvey is not a disclosed medical expert, and he is not qualified to give opinions regarding Armor personnel's use of a suction device. Plaintiff denies Armor's arguments but fails to respond to Armor's specific arguments with any substance. (*See* Dkt. 90). Therefore, these statements (Dkt. 53-1, at 5-6 ¶¶ 25-29; Dkt. 54-1, at 5-6 ¶¶ 25-29) are inadmissible and must be disregarded by the Court.

Finally, McKelvey's statements indicating that he believes Armor staff used the suction device on Plaintiff (Dkt. 53-1, at 9 ¶¶ 28-29) are inadmissible as not based on personal knowledge. McKelvey states in his declaration that he did not personally witness any person use the suction device on Plaintiff, and his conclusion is based (1) on his review of video footage that he states did not show Plaintiff's upper body or use of any suction device, and (2) on his review of third-party reports. (*Id.*). Further, McKelvey states only that he "believe[s]" the device brought into the hallway was a suction device and that the device "presumably" was taken off camera to where Plaintiff was located. (*Id.* ¶ 28). None of these statements are based on personal knowledge, but on mere belief and speculation.

## B. Declaration of Shannon Clark

Second, Plaintiff submits a declaration from Shannon Clark. (Dkt. 53-2; Dkt. 54-2).[8] Clark states in his declaration that he was employed by the Tulsa County Sheriff's Office and worked as the Jail Administrator at DLM. (Dkt. 53-2, ¶ 1). Clark states that, during his employment, he became familiar with Armor's practices, including Armor's practice of medication administration at DLM. (*Id.* ¶¶ 2-3). Based upon his observations, Clark states Armor's standard practice was to not continue medications prescribed to arrestees at DLM until their medications could be verified, and Armor would take measures to delay getting inmates their medications "if Armor concluded the consequences of denying medication would not manifest until after the arrestee was discharged from the facility." (*Id.* ¶¶ 5-8). Clark states that Glanz was made aware of the practice through meetings prior to September 2014 but, based on Clark's observation, allowed the practice to continue. (*Id.* ¶¶ 9-10).

Clark further states he was aware of Armor's use of electronic medical records at DLM and, based upon his experience, he "came to believe that Armor's medical record system was flawed and could not be accepted at face value." (*Id.*

---

[8] The declaration is identical in both Responses to the Motions for Summary Judgment. For simplicity, the Court refers primarily to Dkt. 53-2 throughout this section.

¶¶ 11-12).  Clark states he observed Armor "frequently understaffing the medical unit," and he "believe[s]" staffing issues caused or contributed to "routine errors or false entries" made by Armor employees.  (*Id.* ¶¶ 12-13).  Clark states that, prior to September 2014, he was "aware" of instances where Armor employees had "forged, deleted, or otherwise improperly manipulated" the electronic medical records at DLM, and he "believe[s]" that Glanz was aware of the practice but, based on Clark's observations, Glanz allowed it to continue.  (*Id.* ¶¶ 14-16). Finally, Clark states he is familiar with the jail layout and camera system, and he is "aware of occasions where Armor personnel attempted to intubate inmates" at DLM.  (*Id.* ¶¶ 17-18).

As with the McKelvey Declaration, Armor moves to strike the Clark Declaration, arguing it is not based on personal knowledge, contains inadmissible hearsay, is comprised of mere conclusory statements, and contains improper expert opinion testimony by a witness who was not disclosed as an expert witness in accordance with the scheduling order, nor who is qualified to render such expert opinions.  (Dkt. 71).  Glanz and Regalado also move to strike the Clark Declaration, for largely the same reasons.  (Dkt. 82).  Plaintiff responds that striking the declaration is unwarranted.  (Dkt. 90).

The Court agrees with the defendants that nearly all the statements in Clark's declaration are not based on personal knowledge and render inadmissible non-expert opinions and speculation. Clark's statement that he became "familiar" with Armor's practices during his employment at DLM is insufficient to establish personal knowledge of Armor's medication practices, staffing, or use of electronic medical records at DLM. Clark does not establish that he supervised Armor staff or worked with them, but simply that he "observed" their practices during an unspecified period of time and reached conclusions based on his "understanding" of their practices.

Moreover, Clark does not establish any personal knowledge, only his "belief," that Armor's medical record system was flawed or contained error or false entries. As explained above, a statement of mere "belief" is not admissible in a declaration. Nor does Clark establish his personal knowledge of Glanz's awareness or involvement in Armor's practices. Clark does not state he attended any of the described "meetings" at which Glanz was supposedly made aware of certain medical practices. Finally, Clark's stated "awareness" of Armor's attempt to intubate inmates does not establish personal knowledge of such occasions, as he could have obtained his awareness from any source, including inadmissible

hearsay of such events. All of these statements in the Clark Declaration are improper and must be stricken from the record.

In her Response brief, Plaintiff's arguments in support of the Clark Declaration are largely identical to those made in support of the McKelvey Declaration. (*See* Dkt. 90). Plaintiff argues Clark's position at DLM does not disqualify him from having personal knowledge of Armor's practices. However, Plaintiff introduces no evidence to establish Clark's position at DLM would place him in a position to know of or render opinions about Armor's medical practices, including its prescription practices, medical records practices, or staffing levels. Plaintiff further argues his "awareness" of certain facts does not preclude his personal knowledge of them. Again, Plaintiff introduces no evidence to establish Clark's personal knowledge of Armor's practices or Glanz's awareness of or response to those practices. "Awareness" of a fact may be achieved through inadmissible means, such as hearsay, and Clark's Declaration does not explain at all how he became "aware" of the stated facts. Finally, Clark's statements of his "belief" of certain facts are not supported with any evidence and fall into the realm of opinion that Clark is not qualified to render. Therefore, the entire Clark

Declaration will be stricken and not considered by the Court on summary judgment.[9]

## II.    Armor's Motion for Summary Judgment

The Court next turns to the merits of Armor's Motion for Summary Judgment. (Dkt. 43). In its Motion, Armor argues Plaintiff fails to establish a constitutional violation against it for denial of medical care. Armor further argues Plaintiff cannot meet her prima facie burden of proving medical negligence, and Plaintiff's negligence claims are time-barred. In her Response (Dkt. 53), Plaintiff argues her case was timely filed, and her negligence claim may proceed under a *res ipsa loquitur* theory. Plaintiff also argues that Armor's practice of medication administration is unconstitutional.

### A.    Section 1983 Municipal Liability (Count VIII)

Plaintiff alleges Armor is liable under 42 U.S.C. § 1983 for its failure to implement appropriate policies with respect to the medical care of inmates, which led to acts of deliberate indifference to Plaintiff's serious medical needs, health, and safety. (*See* Dkt. 3-3, ¶¶ 136-145). Armor contends Plaintiff cannot prevail on

---

[9] As with the McKelvey Declaration, Plaintiff appears to complain in his Response that it is improper to strike Clark's assertions related to Clark's own name and employment history. While those statements are not themselves improper, they are meaningless without the subsequent paragraphs, which are stricken as improper. Therefore, the Court finds no basis for considering only the beginning paragraph of the Clark Declaration.

26

this claim, because she cannot link her "policy" argument to any underlying constitutional violation by any of Armor's employees, which is a necessary element for a § 1983 claim for municipal liability.  To state a claim under § 1983 against a municipality, a plaintiff must prove:  "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation."  *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs,* 151 F.3d 1313, 1316 (10th Cir. 1998) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978)).

Armor contends, and the Court agrees, that Plaintiff's municipal liability claim fails on the first element of the test—that an Armor employee committed a constitutional violation against Plaintiff.  Under the Eighth Amendment, prisoners have a constitutional right to medical care, which is violated when doctors or prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).[10]  Deliberate indifference "involves

---

[10] Although Plaintiff seeks relief pursuant to the "Eighth and/or Fourteenth Amendment" (*see* Dkt. 3-3), her claims for deliberate indifference related to medical treatment are properly addressed under the Eighth Amendment, because she was a convicted inmate.  Pretrial detainees are protected under the Fourteenth Amendment's due process clause while convicted inmates are protected by the Eighth Amendment.  *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985).  When Plaintiff was booked into DLM on September 15, 2014, she had been convicted of DUI Alcohol-Second Offense and Leaving Scene of Collision Involving Property Damage.  (*See* Dkt. 46-1 (Judgment and Sentence in Tulsa County Case No. CF-14-1850).  Accordingly, Plaintiff was not a pretrial detainee, as she had already been convicted of a crime.

both an objective and a subjective component." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). To satisfy the subjective component, there must be evidence that "the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer,* 511 U.S. at 837). However, the "'negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'" *Self*, 439 F.3d at 1233 (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)).

Problematically, Plaintiff has not identified a single Armor employee or agent who allegedly violated her constitutional rights. (*See* Dkt. 43-3 (Plaintiff Deposition), 83:8-16, 118:6-122:23). Moreover, Plaintiff has not identified a single action or inaction committed by an Armor employee or agent that violated her constitutional rights. (*See id.*, 137:2-5). In the absence of a claim that any

28

unidentified nurses, doctors, or other Armor personnel violated her constitutional rights, Plaintiff cannot prevail on a claim that an Armor policy or practice caused such a violation. *See Olsen*, 312 F.3d at 1317-18 (10th Cir. 2002). Even if Plaintiff were able to demonstrate a constitutional violation, Plaintiff does not identify any specific policy or practice that prevented Armor's healthcare staff from providing healthcare to Plaintiff at DLM.

Here, it is undisputed that Plaintiff received Clonidine to manage her withdrawal symptoms, which the Tenth Circuit has approved as a treatment for withdrawal symptoms. *Boyett v. Cnty. of Wash.*, 282 F. App'x 667, 674 (10th Cir. 2008). Plaintiff does not dispute Clonidine was an appropriate treatment or that she was appropriately monitored during her detox period. Plaintiff has not shown it was medically necessary that she receive her preferred medication instead of Clonidine and Phenergan. *See Perkins v. Kansas Dep't of Corrs.,* 165 F.3d 803, 811 (10th Cir.1999) ("[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation."). Further, Plaintiff has provided no evidence that any Armor policy was improper or that the policy caused any of Plaintiff's injuries.

Moreover, it is undisputed that Plaintiff was no longer detoxing at the time her seizing began on October 3, 2014. (*See* Dkt. 43-3 (Plaintiff Deposition),

131:16-132:2). It is further undisputed that Plaintiff had no medical history of withdrawal seizures, and that Plaintiff did not notify Armor she was at risk of suffering from withdrawal seizures. (*See id.*, 21:21-22:6, 24:17-25, 95:5-22; Dkt. 43-4 (Inmate Requests)). In addition, Plaintiff made no medical complaints between September 24, 2014, and October 3, 2014, the date of her first seizure. Plaintiff's utter lack of evidence in support of her claim is fatal.

Finally, Plaintiff's allegation that she suffered an esophageal perforation as a result of traumatic intubation by Armor personnel is entirely unsupported. In her Response, Plaintiff claims, without evidence, that a genuine dispute remains among the parties over whether Armor or AMR perforated her esophagus, and she asserts Armor is responsible because AMR denies it caused the perforation. Even if Armor personnel did cause the esophageal injury, Plaintiff presents no evidence that such an injury was the result of Armor's deliberate indifference linked to any policy or practice. In short, Plaintiff claims no medical error that rises to the level of a constitutional violation. *See Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976) ("a difference of opinion as to treatment or diagnosis between the prisoner and the medical staff of the prison . . . cannot alone give rise to a cause of action."). The lack of a constitutional violation by an Armor employee negates a finding of liability against Armor on a municipal liability theory, even if Armor's policies

might have authorized such harm.  *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).

In her Response, Plaintiff claims that Armor's medication administration policy led to her seizures and subsequent traumatic intubation.  Plaintiff contends "her condition rapidly deteriorated" after Armor failed to provide Plaintiff with her medications, pursuant to its practice of not providing continuity of care in the administration of medication.  (Dkt. 53, at 10).  Plaintiff further argues a question of fact remains as to whether Armor's practices unreasonably endangered Plaintiff's future health, citing *Helling v. McKinney*, 509 U.S. 25 (1993) (holding that the health risk posed by involuntary exposure of a prison inmate to secondhand smoke could form the basis of an Eighth Amendment claim).

However, Plaintiff provides no admissible evidence to support these arguments.  A plaintiff alleging a municipal liability claim must identify a policy or custom that caused the injury and then demonstrate "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).  Here, Plaintiff offers no medical expert testimony to establish a causal link between any Armor policy and Plaintiff's injuries or risk of future injury.  Critically, there is no evidence presented to link Armor's medication policy

with Plaintiff's seizures and traumatic intubation, particularly given that Plaintiff was no longer detoxing when her seizures began. Plaintiff's vague, unsupported arguments are insufficient to overcome summary judgment.[11] Summary judgment in Armor's favor is appropriate with respect to this claim.

## B. Negligence (Counts II and V)

In these Counts, Plaintiff alleges Armor was negligent by failing to provide competent medical treatment to Plaintiff, even as her medical condition deteriorated. Plaintiff further alleges Armor negligently hired and trained its staff, which caused harm to Plaintiff. Armor argues the negligence claims against it fail, because Plaintiff has failed to meet her *prima facie* burden of proving medical negligence. Under Oklahoma law, the elements of medical negligence are (1) the defendant owed a duty to protect the plaintiff from injury; (2) the defendant failed to properly exercise or perform that duty; and (3) the defendant's breach of that duty proximately caused the plaintiff's injuries. *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 263 (Okla. 1982) (citations omitted).

---

[11] In her Response, Plaintiff additionally claims she cannot fully respond to Armor's Motion for Summary Judgment, because there is certain "highly relevant video of the incident" that has not been made available to Plaintiff. The discovery deadline in this case passed on August 18, 2017, and the Court denied Plaintiff's request to extend the discovery deadline (Dkt. 92). Plaintiff never sought the Court's assistance to compel production of this video. Therefore, the Court denies Plaintiff's request to hold Armor's motion in abeyance to determine the location of the missing video.

To establish a *prima facie* case of medical negligence, a plaintiff must not only present admissible evidence, but also provide a medical expert opinion as to the three negligence elements of minimum standard of care, breach of that duty by the defendants, and proximate causation. *Robertson v. Lacroix*, 534 P.2d 17, 20 (Okla. Civ. App. 1975); *Boxberger v. Martin*, 552 P.2d 370, 373 (Okla. 1976); *Duckett v. U.S., Dep't of Veterans Affairs*, 2010 WL 3909340, at *3 (W.D. Okla. Sept. 30, 2010). Plaintiff cannot avoid summary judgment by relying on allegations in the pleadings or the unsupported contention that genuine issues of material fact exist.

Here, Plaintiff has not provided any medical expert reports in support of her Oklahoma medical negligence claims. By contrast, Armor has provided a medical expert, Dr. Hellerstein, who stated in his expert report that Armor acted within the applicable standard of care at all times with regard to its care and treatment of Plaintiff (Dkt. 43-6). Plaintiff presents no evidence to indicate that the care or treatment she received at DLM was below the standard of care.

Plaintiff also provides no evidence, expert or otherwise, to show that her seizures or traumatic intubation were linked to Armor's alleged negligence. At summary judgment, the plaintiff must show through expert testimony that the defendant's negligence caused the plaintiff's injury to a reasonable degree of

certainty and probability. *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467, 471 (Okla. 1987). The "mere possibility" that the defendant may have caused the harm is insufficient to establish causation. *Hardy v. Southwestern Bell Tel. Co.*, 910 P.2d 1024, 1027 (Okla. 1996). "Negligence can never be *presumed* from showing no more than the happening of the harmful event." *Harder v. F.C. Clinton, Inc.*, 948 P.2d 298, 304 (Okla. 1997) (citations omitted). Here, in the absence of any evidence from Plaintiff to demonstrate the elements of medical negligence were satisfied, summary judgment in Armor's favor is appropriate. Likewise, in the absence of any admissible evidence to raise an issue as to whether Plaintiff's injury resulted from the breach of a duty of care in Armor's hiring, training, or supervision, Plaintiff's claim in this regard also fails. The uncontroverted record establishes that Plaintiff's medical care at DLM was medically appropriate and that Armor was responsive to Plaintiff's medical needs.

In her Response, Plaintiff argues no expert testimony in this case is required, because she is proceeding on a theory of *res ipsa loquitur*. Plaintiff relies on 76 Okl. St. § 21 in support of this theory, which permits a presumption of negligence in the rendering of medical care if the following foundation facts are first established: "(1) The plaintiff sustained an injury; (2) Said injury was proximately caused by an instrumentality solely within the control of the defendant or

34

defendants; and (3) Such injury does not ordinarily occur under the circumstances absent negligence on the part of the defendant." However, § 21 also provides: "If any such fact, in the discretion of the court, requires a degree of knowledge or skill not possessed by the average person, then in that event such fact must be established by expert testimony." *Id.*

Here, Plaintiff has failed to provide any evidence that Armor was in exclusive control of any instrumentality that caused the alleged harm of an esophageal perforation. It is undisputed that Armor personnel attempted suction, but Armor's medical expert, Dr. Hellerstein, states that "it would be unheard of for the suction procedure to cause an esophageal perforation." (Dkt. 77-1 (Dr. Hellerstein Affidavit), at 3). Plaintiff has not presented any evidence that Armor ever attempted to intubate Plaintiff. To the contrary, it is undisputed that Armor turned over Plaintiff's care once the ambulance responders arrived, and Armor has presented uncontroverted evidence that the emergency responders, not Armor, intubated Plaintiff. (*See* Dkt. 43-1 (Armor Records), at 60, 90-91; Dkt. 43-14 (Dr. Gable Statement)). Further, to the extent Plaintiff argues Armor's "use of an anti-inflammatory medication immediately prior to the arrival of AMR supports the inference that it was Armor that perforated Plaintiff's esophagus," (Dkt. 53, at 2), Dr. Hellerstein states Plaintiff was not administered anti-inflammatory medication

at that time.  (Dkt. 77-1 (Dr. Hellerstein Affidavit), at 3).  Dr. Hellerstein states that Plaintiff was given only Benadryl and Ativan immediately prior to AMR's arrival, and neither medication is an anti-inflammatory.  (*Id.*).

Plaintiff has also failed to show that esophageal perforations do not ordinarily occur absent negligence.  Dr. Hellerstein states in his report it is his opinion that Plaintiff's esophageal perforation occurred as a complication of traumatic intubation.  (Dkt. 43-6, at 7).  However, Dr. Hellerstein further clarifies that "esophageal perforation is a known complication of intubation that can occur even with the best of care and in the absence of negligence in the ordinary practice of medicine." (Dkt. 77-1 (Dr. Hellerstein Affidavit), at 5).  Dr. Hellerstein further states, "[w]hether or not an esophageal perforation is the result of negligence requires the opinion of a qualified medical professional and is not a determination that a non-medical person would be qualified to make."  (*Id.* at 5-6).  Consequently, this is not an appropriate case for application of the *res ipsa loquitur* doctrine.  Plaintiff's failure to present any evidence in support of negligent acts by Armor, or to rebut Armor's evidence that Plaintiff received adequate medical care

at DLM, mandates summary judgment in Armor's favor on the negligence claims.[12]

## III. Glanz and Regalado's Motion for Summary Judgment

Finally, the Court turns to the merits of Glanz and Regalado's Motion for Summary Judgment. (Dkt. 46). In their Motion, Glanz and Regalado argue Plaintiff fails to establish a constitutional violation against them for denial of medical care. Glanz further asserts qualified immunity from Plaintiff's supervisory liability claim against him in his individual capacity (Count VII). Regalado claims that, for the same reasons, he is likewise entitled to judgment in his favor for Plaintiff's official capacity claims against him based on negligence, violation of Plaintiff's constitutional rights under § 1983, and violations of the Oklahoma Constitution. (Counts I, IV, VI, IX). In her Response (Dkt. 54), Plaintiff argues the defendants have destroyed or failed to produce the most relevant video of the incident, her constitutional rights were violated, and the defendants' practices impose liability under § 1983.

---

[12] Because the Court dismisses Plaintiff's claims for negligence against Armor due to lack of evidence, the Court will not consider Armor's argument that the negligence claims are barred under the statute of limitations.

### A. Eighth Amendment Violation – Deliberate Indifference (Counts VI and VII)

#### 1. Standard of Review

As explained above in Part II.A, prisoners have a constitutional right to medical care under the Eighth Amendment, which is violated when doctors or prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).[13] Deliberate indifference "involves both an objective and a subjective component." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999)). The question raised by the objective prong "is whether the alleged harm . . . is sufficiently serious . . . , rather than whether the

---

[13] As explained above in Part II.A, n.10, Plaintiff's claims for deliberate indifference related to medical treatment are properly addressed under the Eighth Amendment, because she was a convicted inmate.

symptoms displayed to the prison employee are sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).

To satisfy the subjective component, there must be evidence that "the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Mata*, 427 F.3d at 751 (quoting *Farmer,* 511 U.S. at 837). The subjective component may be satisfied if the jury can "infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer*, 511 U.S. at 842).

Moreover, the subjective component may be satisfied if the defendant's "delay in providing medical treatment caused either unnecessary pain or a worsening of her condition. Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755. However, the "'negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'" *Self*, 439 F.3d at 1233 (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)). "[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a [prison health official]

merely exercises his considered medical judgment," which traditionally includes decisions such as "whether to consult a specialist or undertake additional medical testing." *Id.* at 1232.

The Tenth Circuit recognizes two types of conduct amounting to deliberate indifference in the context of prisoner medical care. "First, a medical professional may fail to treat a serious medical condition properly." *Sealock*, 218 F.3d at 1211. When this type of conduct is alleged, "the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent." *Id.* (citing *Estelle*, 429 U.S. at 105-06). Second, prison officials may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.* (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). A prison medical professional who serves solely "as a gatekeeper for other medical personnel capable of treating the condition" may be liable under this standard if he or she "delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Id.*

## 2. Analysis

Here, Glanz and Regalado argue Plaintiff's deliberate indifference claims fail, because she does not name a single individual at the jail who allegedly

violated her constitutional rights or offer any evidence of specific acts at the jail that violated her right to receive adequate medical care. Glanz and Regalado contend that, without identifying specific acts, omissions, or actors, Plaintiff cannot prove that any injury was the result of a culpable state of mind. The Court agrees. The subjective component of the deliberate indifference test requires "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Farmer*, 511 U.S. at 838 (quotation omitted). Such an inquiry is impossible without identification of specific individuals or acts that violated Plaintiff's constitutional rights.

As explained above with respect to Armor, the record shows Plaintiff was consistently and promptly treated for her withdrawal symptoms and subsequent seizures. Moreover, to the extent Plaintiff contends her seizures were the result of withdrawal from her medications, it is undisputed that Plaintiff was no longer detoxing at the time her seizures began. Accordingly, Glanz and Regalado are entitled to summary judgment in their favor with respect to the deliberate indifference claims pertaining to Plaintiff's withdrawal symptoms and subsequent seizures.[14] *See, e.g., Olsen*, 312 F.3d at 1317-18 ("We will not hold a municipality

---

[14] In their Motion for Summary Judgment, Glanz and Regalado argue summary judgment is appropriate with respect to Plaintiff's claims pertaining to (1) her placement on suicide watch at

'liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers.'") (quoting *Hinton v. City of Elwood*, 997 F.2d at 782) (alteration in original).

In her Response, Plaintiff claims Glanz exposed her to a substantial risk of serious harm by allowing Armor to deny her Lexapro, which resulted in her seizures more than two weeks after she was booked into the jail. Plaintiff contends Armor had a practice of interrupting inmate care by denying them prescribed medication until the inmate was discharged or suffered a serious medical complication. She further contends, without citation to admissible evidence, that Glanz knew about this practice and allowed it to continue.[15] Plaintiff argues she was exposed to the recognized risks and side effects of immediate cessation of Lexapro, including convulsions, confusion, nausea or vomiting, and diarrhea. (Dkt. 54, at 8). Plaintiff further argues a question of fact remains as to whether Armor's practices unreasonably endangered Plaintiff's future health, citing *Helling v. McKinney*, 509 U.S. 25 (1993) (holding that the health risk posed by involuntary

the jail, (2) any delay in her transfer to OSU Medical Center following her seizures, or (3) failure to provide adequate medical care during her brief transfer back to the jail on October 17, 2014. (*See* Dkt. 46). However, in her Response, Plaintiff fails to respond to any of these arguments or otherwise address these matters. (*See* Dkt. 54). Therefore, the Court considers these claims abandoned and will not further consider Glanz and Regalado's arguments pertaining to these issues.

[15] In support of her arguments regarding deliberate indifference, Plaintiff cites only to the now-stricken Declarations of McKelvey and Clark.

exposure of a prison inmate to secondhand smoke could form the basis of an Eighth Amendment claim).

Plaintiff's arguments are unavailing, as she provides no admissible evidence to support them. In particular, Plaintiff offers no medical expert testimony or other admissible evidence to establish a causal link between any Armor policy and Plaintiff's injuries or risk of future injury. A plaintiff alleging a municipal liability claim must identify a policy or custom that caused the injury and then demonstrate "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). Plaintiff fails to establish any individual violated her constitutional rights, and there is no municipal liability in the absence of any underlying constitutional violation by its officers. *See Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009) ("To the extent [plaintiff's] argument suggests that the county can be liable, even if no individual government actor is liable, it is precluded by our prior precedent.") (citing *Olsen*, 312 F.3d at 1318). Plaintiff's vague, unsupported arguments and generalized theories of risk are insufficient to overcome summary judgment.[16]

---

[16] As with Armor, Plaintiff asserts she cannot fully respond to Glanz and Regalado's Motion for Summary Judgment, because there is certain "highly relevant video of the incident" that has not

## B.     Qualified Immunity

Glanz further contends he is entitled to qualified immunity from personal liability for the § 1983 supervisory liability claim alleged against him. "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, in a § 1983 action in which the affirmative defense of qualified immunity from liability is at issue, the plaintiff bears the burden to show (1) the defendant's conduct violated his constitutional rights, and (2) those rights were clearly established at the time of the defendant's alleged misconduct. *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996).

As explained above, Plaintiff has failed to demonstrate Glanz violated Plaintiff's Eighth Amendment rights by allowing Armor to deny her prescribed

---

been made available to Plaintiff. The discovery deadline in this case passed on August 18, 2017, and the Court denied Plaintiff's request to extend the discovery deadline (Dkt. 92). Plaintiff never sought the Court's assistance to compel production of this video. Moreover, Plaintiff fails to explain how the missing video would be relevant to her claims against Glanz and Regalado, as she does not claim their involvement in perforating Plaintiff's esophagus. Therefore, the Court denies Plaintiff's request to hold Glanz and Regalado's motion in abeyance to determine the location of the missing video.

medication at the jail or otherwise allow Armor's medication practices to continue. It is undisputed that Glanz had no personal contact with Plaintiff, and the record reveals no evidence that Glanz had direct or contemporaneous knowledge of Plaintiff's treatment by medical or jail staff. Further, to the extent Plaintiff contends Glanz ratified Armor's improper medication practices, Plaintiff provides no proof that Armor's medication practice was unconstitutional or that Glanz was even aware of such practice. Plaintiff's failure to satisfy the first prong of the qualified immunity analysis renders it unnecessary for the Court to consider whether Plaintiff satisfied her burden under the second prong. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 780 (10th Cir. 1993).

## C.  State Law Negligence and Constitutional Claims (Counts I, IV, IX)

Regalado further contends the state law claims against him in his official capacity must fail, because Plaintiff has provided no evidence that she was denied medical attention at the jail or that the hiring, training, or supervision of any officer or employee was improper. As explained above, the record demonstrates Plaintiff received appropriate and prompt care for her medical issues, including her withdrawal symptoms and seizures. Plaintiff has not established that Armor or jail employees breached any duty of care or negligently denied her medical treatment.

45

Nor has Plaintiff established any issue concerning hiring, training, or supervision at the jail or any violation of the Oklahoma Constitution. Plaintiff does not address any of the state law claims in her Response brief. Accordingly, Regalado is entitled to summary judgment on Counts I, IV, and IX.

## CONCLUSION

For the reasons detailed above, Defendant Armor's Motion for Summary Judgment (Dkt. 43) is **GRANTED**. Defendants Regalado and Glanz's Motion for Summary Judgment (Dkt. 46) is **GRANTED**. The Motions to Strike (Dkts. 71, 72, 82) are **GRANTED**.

James H. Payne
United States District Judge
Northern District of Oklahoma